## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, AS SUBROGEE AND ASSIGNEE OF DON HEWLETT CHEVROLET BUICK, INC.  D/B/A DON HEWLETT CHEVROLET BUICK AND D/B/A HEWLETT VOLKSWAGEN, | §<br>§<br>§<br>§<br>§<br>§ | |
| | § | CASE NO. _____ |
| *Plaintiff,* | §<br>§ | |
| **v.** | §<br>§ | |
| CDK GLOBAL, LLC, | §<br>§ | |
| *Defendant.* | §<br>§ | |

## ORIGINAL COMPLAINT

Travelers Casualty and Surety Company of America ("Travelers"), as Subrogee and Assignee of Don Hewlett Chevrolet Buick, Inc.[1] d/b/a Don Hewlett Chevrolet Buick and d/b/a Hewlett Volkswagen (referred to collectively herein as "Hewlett"), files its Original Complaint against CDK Global, LLC ("CDK"), and respectfully shows the Court as follows:

## NATURE OF THE ACTION

1.      This lawsuit involves the respective rights and obligations of the parties following two rapid-succession ransomware attacks conducted by a third-party against CDK, which resulted in damages and expenses to Hewlett.

2.      CDK is a dominant player in technology for Dealer Management Systems, software systems used by dealerships in the automotive industry to conduct all aspects of their business. Hewlett was injured and suffered damages and expenses when CDK, without warning, cut off Hewlett's access to software and to Hewlett's own dealer-specific data that Hewlett relies upon

---

[1] Don Hewlett Chevrolet Buick, Inc., as the first-named insured, acts on behalf of and includes all additional insureds.

for its operations. Travelers has paid $1,534,394.00 in indemnity payments to Hewlett for Hewlett's insured loss, and Hewlett has also sustained additional uninsured loss, for all of which Travelers (as subrogee and assignee of Hewlett) now sues CDK.

## PARTIES

3.    Travelers is a Connecticut company with its principal place of business at One Tower Square, Hartford, Connecticut 09183.  It is a citizen of Connecticut, but it is not a citizen of New Jersey or Delaware.  Pursuant to a cyber insurance policy, Travelers has paid $1,534,394.00 in indemnity payments to Hewlett for Hewlett's insured loss and is subrogated to Hewlett's rights and claims to the extent of that payment. Hewlett also assigned to Travelers additional (and uninsured) amounts, rights, and claims against CDK arising from the matters set forth herein.

4.    CDK is a limited liability company. Analysis of CDK's citizenship (determined by the citizenship of each member traced through as many levels as necessary until reaching a natural person or corporation) demonstrates that CDK is a citizen of Delaware, but not a citizen of Connecticut:

   a.  CDK's sole member is CDK Global Holdings II, LLC;

   b.  CDK Global Holdings II, LLC's sole member is CDK Global Holdings LLC;

   c.  CDK Global Holdings LLC's sole member is CDK Global II LLC;

   d.  CDK Global II LLC's sole member is Central Parent LLC;

   e.  Central Parent LLC's sole member is Central HoldCo LLC;

   f.  Central HoldCo LLC's sole member is Central TopCo Inc., which is a citizen of Delaware and not a citizen of Connecticut.

Accordingly, diversity of citizenship exists between Plaintiff and Defendant.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  There is complete diversity between the parties, and the facts set forth herein demonstrate that the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because CDK conducts business in New Jersey, and because a contractual provision drafted by CDK in the relevant agreement between the parties specifies that suits will be filed in the District Court of New Jersey, Newark division.

## FACTUAL BACKGROUND

### CDK Provides Hewlett's Technology

7.      Hewlett is a Texas automobile dealership group that relies upon CDK to provide its necessary technology, including various software, hardware and components, and additional professional services, and data and information hosting, to run its business. Hewlett has no experience, specialized expertise, or knowledge in software development, technology deployment, hardware selection, cybersecurity, data and information hosting, and other services that CDK provides.  Hewlett is therefore wholly dependent upon CDK to provide these types of technology-based goods and products, along with incidental services, and the data and information hosting and access that are necessary for Hewlett's operations.

8.      CDK describes its business as technology solutions in automotive retail, and it boasts 50 years of experience and more than 15,000 retail location clients.  CDK is the largest and most influential technology and software company in the automobile-dealership industry.  Its

position and dominance in the industry are vast, with its technology reportedly facilitating 2.6% of the United States' GDP at the time of the relevant events that damaged Hewlett.[2]

9.      CDK, which describes itself as a technology company that thinks like dealers, with its focus on more customers, increased efficiency, reduced spend, and greater profitability for auto dealers, is well known for its Dealer Management System.  The Dealer Management System, including an integrated software package that can use dealer-specific data, is what Hewlett uses to conduct all aspects of its dealership operations and essential functions (the "software system"). CDK requires Hewlett to use various hardware provided by CDK in conjunction with the software system. CDK also provides incidental professional services associated with the Dealer Management System (the "professional services").

10.      When Hewlett started doing business with CDK, it provided CDK with full and exclusive control over the compilation of Hewlett's dealer-specific data, including the detailed confidential business information about Hewlett and its operations, and including various pieces of personally identifiable information (PII) for Hewlett's customers and other individuals (such as employees involved in operations), as well as sales, warranty, service, and parts records, pricing and inventory.

11.      CDK stores and exclusively controls Hewlett's confidential and dealer-specific real-time operational data and information (and purportedly was providing extensive cyber security to protect the data).  CDK has exclusive control over two identical but separate sets of Hewlett's dealer-specific data (the primary set and the backup set – which CDK says it stores in two separate locations).  Due to the volume and complexity of the data and information compilation, and the fact that it is constantly updated in real-time, Hewlett had and has no other

---

[2] Megan Cerullo, *CDK Global Cyber Attack Leaves Thousands of Car Dealerships Spinning Their Wheels*, CBS News (June 24, 2024), https://www.cbsnews.com/amp/news/cdk-cyber-attack-outage-update-2024).

copy of its dealer-specific data set.  CDK's business model encourages and expects dealerships to provide it with exclusive possession of this data and information.

**Hewlett Relied upon CDK and its Technology**

12.     CDK is effective in marketing its technology capabilities and computer system, including the way it can enable dealerships to access the technology, and is effective in convincing dealerships that use of CDK's technology is integral to their success.

13.     Hewlett is not an expert and does not have experience or specialized knowledge in various aspects of technology and cybersecurity relevant to conducting operations of an automotive dealership group.

14.     CDK, well aware of this lack of expertise on the part of dealership groups, markets to dealerships in a manner to convince the dealerships to rely solely on CDK for all dealership-related technology needs. Indeed, given its business model, CDK *expects* this reliance.

15.     Consistent with CDK's plan, Hewlett became fully dependent upon CDK to operate its dealerships through use of CDK's technology, computer system, and software, including the goods, products, and services related to it. Without the CDK software system and without access to its own dealer-specific data and information stored by CDK, Hewlett has no way to conduct its core functions involving sales, service, repairs, warranty, parts, and other operations, and no access to necessary information such as auto inventory, parts information, and customer records.

16.     CDK cultivated a relationship of trust with Hewlett and convinced Hewlett that it should rely exclusively upon CDK's expertise, superior knowledge, and operations for the scope of technology that Hewlett needed to conduct its business.  Hewlett had trust and confidence in CDK, and CDK exercised its superiority, dominance and influence in that relationship.

17.    CDK entered into various written agreements with Hewlett to provide, among other things, computer software consistent with Hewlett's needs to run its business operations, and the goods, products, and incidental services related to that software, plus necessary hardware.  These agreements addressed the software, including the goods, products, and professional services related to it, that CDK was required to provide as one part of the overall relationship.

18.    Separately, CDK stored, secured, and fully controlled Hewlett's relevant compilation of dealership data and information.  CDK's software was designed in a way that it could work in conjunction with Hewlett's own dealer-specific data and information.

19.    At the relevant time period, Hewlett accessed the software and its necessary data and information by logging in via a VPN connection to a computer system through which Hewlett could operate necessary components of the software and utilize its data and information to carry out transactions.  Hewlett had to be allowed remote access by CDK to conduct its business operations, and it could not conduct its various business functions without that access, which CDK controlled. Hewlett could not access either the necessary software applications or its own dealer-specific data and compilation unless CDK permitted it to do so.

**CDK Terminated Hewlett's Access to the Technology and Hewlett's Own Data**

20.    Beginning on or about June 19, 2024, CDK abruptly cut off Hewlett's access to CDK's operational platforms, CDK's customized software and systems, the incidental professional services and technology services, and to Hewlett's own confidential compilation of dealer-specific data and information that was singularly controlled by CDK, leaving Hewlett unable to function and unable to conduct its business and transactions.  The termination occurred without warning and without explanation to Hewlett.

21.    CDK's own systemic failure was so extreme that CDK similarly cut off the entire industry's access to CDK technology, grinding operations for thousands of automotive dealerships to a halt. The system failure was well known across the automotive industry, and its implications were widely discussed in various press and media.

22.    CDK made a unilateral decision to cut off Hewlett's access, and to keep that shutdown and termination of access in place for weeks, all while providing no information to Hewlett about what was happening and why it was happening.

23.    Critically, CDK provided no information to assist Hewlett in understanding how long the shutdown would continue, how long it would be without access to its technology and software, and how Hewlett should or could react.  Despite CDK's claims that two sets of Hewlett's dealer-specific data compilation were stored in separate locations for security reasons and backup, and its touted expertise and knowledge of the auto dealership business, CDK also provided no options for Hewlett to access or update its own proprietary dealer-specific data and information, leaving Hewlett without the critical data and information it needed to operate.

24.    CDK (according to media reports, since CDK has failed to provide any details regarding what occurred even almost two years later) experienced two catastrophic level cyberattacks on its own computer systems and/or servers and/or components (all referred to herein for simplicity as CDK's "computer system").  Those attacks were referred to in the media as ransomware attacks. The fact that two successful attacks occurred in short order illustrates the inadequacy of both CDK's security and its incident response.

25.     The ransomware attacks directly impacted CDK's technology and computer system, and the attacks also apparently impacted the stored Hewlett data and information.[3] Hewlett remained unable to access, utilize, and update its data, and unable to conduct various transactions without access to its data, while CDK continued to cut off Hewlett's access to it.

26.     During and after the attacks, CDK took further actions that caused injury, damages, and expenses to Hewlett and the industry at large. During and after the ransomware events, CDK prohibited Hewlett's access to CDK's computer system, including the software system, technology, and incidental services, thereby disrupting the entire business operations of Hewlett, as well as thousands of other dealerships and businesses that rely upon CDK's technology for their operations (the "Cyber Incident").

27.     CDK's termination of Hewlett's ability to use CDK's system and services and its termination of Hewlett's access to Hewlett's own proprietary and necessary stored data and information caused a massive disruption in workflow and operations for Hewlett.

28.     Following the attacks, CDK apparently made a $25 million ransomware payment to a third party, presumably because CDK had no other way to resume its operations and/or to regain access to the proprietary dealer data that it held and stored, including Hewett's data and information.

29.     However, even after CDK made the ransomware payment, CDK did not immediately restore Hewlett's access to the CDK technology, software, or incidental services, or to Hewlett's own dealer-specific data and information that was necessary for it to operate.

---

[3] There are ongoing lawsuits, including in the United States District Court for the Northern District of Illinois, filed by consumers and groups who allege they were impacted and/or damaged by the exposure of their PII (some of which was a part of dealership data compilations) and CDK's failure to protect their PII.

30.     To be clear, it was not a failure of cybersecurity by Hewlett that caused this damage. The failure of cybersecurity occurred at CDK, involving CDK's computer system and technology.

31.     The cause of the damage was CDK's own failures, including its lack of cyber resiliency.  CDK's failures to implement reasonable security on its own computer system (which supports and provides Hewlett access to its software system and technology), and CDK's failures to train and supervise employees with access to and responsibility for its computer system resulted in the two cyberattacks and/or ransomware events.

32.     Further, with respect to the data and information that CDK stored and exclusively controlled, CDK's failure to implement proper disaster and cyber incident plans so that Hewlett could access its data and information through some other method caused damage, some of which is still ongoing, to Hewlett.

33.     CDK was responsible for the safety and security of its own vast computer system, including the way that computer system is connected to and/or supports various software systems and the way customers, including Hewlett, could access their dealer-specific data and information. CDK owed many duties (including extra-contractual duties) to ensure that its operations included reasonable security and cyber resilience for its own computer system and technology and services, and to ensure security, redundancy, and cyber resilience for Hewlett's dealer-specific data and the access thereto.

34.     The cyberattacks against CDK could not have come as a surprise to CDK, given its market share, domination in the technology space, and technological acumen.  Prior to the attacks, CDK had repeatedly emphasized the critical nature of safeguarding all computer systems, data, and technology in its annual reports of the dealership industry, where it warned that cybercriminals

continue to target and attack the dealership industry, and that dealerships must assess and reassess security.[4]  But it was CDK itself that had inadequate security and/or protocols.

35.    Prior to the ransomware attacks against it, CDK was aware of its own need for cyber resiliency in its technology operations, because cyberattacks are prolific, and industry standards require CDK to have segmented backup and disaster recovery programs to enable it to quickly restore operations if it suffers a cyberattack.  Yet, as the protracted shutdown to Hewlett's business revealed, CDK lacked proper cyber resilience and other industry standard cyber-hygiene policies, procedures, and technology, and that critical failure by CDK caused extensive damage to Hewlett and its property.

36.    Given CDK's unique and superior position in the industry, and the reliance it expected and received from dealerships like Hewlett, CDK undertook duties – in addition to and greater than those that existed by contract – to ensure its clients were protected from such catastrophic events.  CDK owed duties to continuously remedy any flaws within its own computer system, and duties to integrate and employ adequate and appropriate backups, incident response, and disaster recovery programs, among others. CDK owed duties to protect the data and information it held and stored, including PII within that data.

37.    Because CDK promoted and emphasized the benefits of its technology business and the software system and data hosting, as well as CDK's accompanying security and safety, on a broad basis to Hewlett and others, Hewlett was aware of and relied upon CDK's statements, promotions, and carefully-curated profile. These communications, which appear to have been inaccurate in terms of the true extent of the safety and security of CDK's computer system, computer software, hosting, and/or system overall were provided for the guidance of Hewlett and

---

[4]  CDK Global, *The State of Dealership Cybersecurity 2023*; https://www.cdkglobal.com/insights/2023-state-cybersecurity-dealership-study.

others in their business transactions to induce them into relying upon CDK and its technology and computer system, which included support for the software system.

**Hewlett Could Not Operate Without Access to the Technology and its own Data**

38.     During the period of the extended shutdown that CDK unilaterally elected to impose on Hewlett, Hewlett was unable to conduct the regular business of its dealerships, including sales, service, parts, and warranty, and most other aspects of its business. As a direct result of CDK's failures to protect its own computer system, as well as its failure to provide Hewlett with access to the software system and Hewlett's dealer-specific data and information (as well as the aforementioned failures to properly prepare for this very occurrence), Hewlett sustained both immediate and lasting damage to its operations and its business.

39.     While Hewlett continued to ask for information about when its technology and data and information would be accessible, and any alternate methods or options to access its data in the interim, it received none.  The totality of and extended duration of the shutdown were surprising and damaging to Hewlett because CDK's emphasis on substantial and centralized security is one of the ways that CDK markets its technology, approach, and offerings and convinces dealers to rely upon CDK's software system and submit to CDK's control. CDK misrepresented the sufficiency and efficacy of the cyber security, protection, and resilience provided by its technology.

40.     CDK misrepresented the robust nature of its cyber security for its professional services and ultimate protection and resilience of the access to the hosted dealer data and information, emphasizing that it stored that data in two separate locations, which protected the ability of Hewlett to access the data.  In fact, CDK lacked adequate security and resiliency for the

data, and the access thereto, and failed to carry out its professional services and extra-contractual duties owed to Hewlett.

41.    CDK's failure to implement not just best practices, but industry standard adequate security measures for its own computer system, and by extension for access to the software system and the stored data and information, contrary to CDK's promotion of its centralized security advantage, resulted in a lengthy shutdown of access to the software system and a lengthy inability to access and use the data and information upon which Hewlett relies to operate its business. While CDK preaches that "cybersecurity is a business priority," it is CDK's own failures that resulted in damage to Hewlett.

42.    As the shutdown continued, CDK purposefully withheld information and explanations of what occurred, leaving Hewlett in the dark about how long Hewlett would be unable to conduct business transactions or access its data.  CDK's failure to share that information harmed Hewlett because Hewlett lacked the ability to make informed decisions about how to minimize its losses, resulting in still more loss, damage, and expense to Hewlett.

43.    CDK did not restore Hewlett's access to aspects of the software system and additional access to its data and information until various dates over the course of and extending through July 2024.  But even then, Hewlett lacked the ability to fully operate.  Hewlett's data and information that had been stored exclusively by CDK, by that time, was unusable.  Indeed, it took a substantial additional period of time beyond the initial "access date" for Hewlett to create, rebuild, repair, replace, and update necessary data for reliable use and finally regain full system operations. Some of Hewlett's data remains damaged by inaccuracies (and is not subject to full correction) because of CDK's failures and decision to cut off access.

44.     Because Hewlett could not access and use its own unique and proprietary data and information which CDK exclusively controlled, due to the attacks perpetrated on CDK's computer system, the data was damaged, became obsolete, and was unusable to conduct Hewlett's business. CDK's failure to properly handle the ransomware attacks and Cyber Incident caused damage to Hewlett's property in the form of data and information by making that data and information inaccessible, ultimately rendering it unusable by Hewlett, and potentially exposing it to access and/or control by third parties.  And the property damage was independent from any impacts on the software system.

45.     CDK provided no assistance with the labor and expense necessary to create, rebuild, repair, replace, and update all of Hewlett's necessary data and information that was damaged or rendered unreliable or unusable or permanently unrepairable by CDK's own decisions and actions.

**CDK is Liable to Hewlett**

46.     Given CDK's understanding of the dealership environment, CDK knew how dependent Hewlett was on CDK's technology, goods, and services, and upon CDK in general. Given CDK's understanding of the dealership environment, CDK knew how much Hewlett relied on CDK to provide Hewlett access to its proprietary compilation of dealer-specific data and information, CDK knew or should have known the catastrophic impact any cyber incident at CDK (especially without the proper protective and resilience measures in place) would have on Hewlett's data and information.

47.     CDK occupied the dominant role in the relationship with Hewlett, cultivated an ongoing relationship of trust, and counted on Hewlett's dependence upon CDK as part of the

business relationship. CDK knew or should have known the catastrophic impact any cyber incident at CDK would have on Hewlett.

48.    CDK is a large and sophisticated organization with the resources to deploy the most robust cybersecurity protocols, and the resources and experience to train and supervise its employees to carry out all standard and expected safety and security measures. CDK knew, or should have known, that the development and use of such protocols, training, and supervision were necessary to fulfill its applicable duties to Hewlett. Thus, its failure to provide adequate security, and its failure to train and supervise its employees to perform their duties, is intentional, willful, reckless, and/or grossly negligent in this context.

49.    CDK disregarded the rights of Hewlett and CDK's own obligations and duties, including extra-contractual duties, to Hewlett by intentionally, willfully, recklessly, negligently, or grossly negligently failing to take adequate and reasonable measures to ensure that CDK's own computer system was protected against unauthorized intrusion; failing to disclose that it did not have adequate security protocols and training practices in place to appropriately safeguard its computer system and protect Hewlett's necessary access to the software system and Hewlett's own data; failing to take standard and reasonably available steps to prevent the Cyber Incident against CDK's own computer system; failing to have industry standard segmented backups and processes to quickly restore Hewlett's operations and Hewlett's access to its own data; concealing the existence and extent and expected duration of the Cyber Incident for an unreasonable time; failing to provide Hewlett prompt and accurate information regarding the reason for and continuing duration of the shutdown of access to the software system; and failing to provide viable operations to ensure the continuity of Hewlett's business operations.

50.     CDK's actions and failures to act, as well as its misrepresentations and/or omissions or failures to disclose information that it had a duty to disclose, are the direct and/or proximate cause of damage, loss, and injury to Hewlett.

51.     CDK's failure to provide information necessary for Hewlett to understand how long the Cyber Incident would impact its business hampered its ability to take mitigating measures to reduce its injury and damages and is a prime example of a dominant technology company's failure to act as a good business partner to Hewlett.

52.     As a result of CDK's ineffective and inadequate computer security practices, and its ineffective and inadequate training and supervision of its employees, the Cyber Incident against CDK's own computer system, and the foreseeable consequences of it, caused injury and damage to Hewlett.  Hewlett has suffered damages and expenses exceeding $1.5 million.

## COUNT ONE - BAILMENT

53.     Hewlett provided its proprietary dealer-specific data and information to CDK, and CDK accepted that data and agreed to host it for the purpose of providing Hewlett with access to it.  CDK's acceptance of the data resulted in a bailment relationship, in which CDK was required to hold and secure the data, but also to provide access to Hewlett as owner of the data.  The data itself had substantial value and use to Hewlett.

54.     Hewlett delivered exclusive possession of such data to CDK, and, given its marketing practices and approach, CDK expected and accepted exclusive possession of the data.

55.     CDK knew and understood that it held the only two sets of Hewlett's compilation of proprietary data and information – the primary set and the *only* backup set.

56.     Despite this, CDK failed to deal with the bailed property – the compilation of data and information – according to the terms of the bailment. Specifically, CDK failed to provide

Hewlett with the necessary and appropriate access.  Instead, CDK prevented all access for many weeks.  By the time CDK reinstituted any level of access for Hewlett, the data had become obsolete and unusable, and parts of the data were permanently damaged and unable to be repaired, which would not have occurred had CDK provided access to Hewlett in a timely manner.

57.     CDK maintained sole control over Hewlett's compilation of dealer-specific data and information, and Hewlett could not access it without CDK allowing the access to occur. Additionally, and as expected (and likely known) by CDK, Hewlett had no other method to access the data and had no separate backup storage of the data.

58.     CDK failed to fulfill the bailment, including but not limited to by failing to exercise reasonable care for the data and information in its exclusive possession, failing to provide Hewlett with access to its proprietary dealer-specific data and information on an ongoing basis, and failing to prohibit damage to the data and information and/or its value to Hewlett.

59.     CDK's actions and inactions caused damage to Hewlett and its property, for which Travelers now sues.

### COUNT TWO – CONVERSION

60.     CDK held and stored the compilation of Hewlett's proprietary dealer-specific data and information.

61.     During and after the Cyber Incident, CDK committed an unauthorized act of dominion and control over Hewlett's data and information, inconsistent with Hewlett's property rights for its own data, by wrongfully refusing to allow access to and necessary use of that property.

62.     Hewlett, at all times, owned the data and information and had a right to immediate possession of the data and information, particularly in the form of access to and use of that property.

63.    Despite requests for access, CDK wrongfully interfered with Hewlett's right to possession of the data and information, causing damage to Hewlett and its property, for which Travelers now sues.

## COUNT THREE - BREACH OF CONTRACT

64.    CDK markets itself to dealerships in the automotive industry, offering to enter into agreements to provide the critical technology (including software, hardware, and incidental services) that Hewlett relies upon for all aspects of its dealer operations.

65.    CDK's software system is a unique type of good or product, designed to adequately support multi-store and/or multi-brand dealerships that have more complex software needs than smaller entities.  When Hewlett agreed to do business with CDK, CDK was one of a small number of technology companies that offered such a complex software system, with the ability to utilize dealer-specific data. CDK's particular software system made it a dominant party in the DMS industry. That good or product was particularly suited for Hewlett's needs and was necessary for Hewlett's type of business operations.

66.    In terms of any relationship with an individual dealership, especially with regard to technology matters, CDK is indisputably the dominant party, and in that position CDK can dictate the terms of the relationship.  CDK drafts written agreements with dealerships that are one-sided, benefitting CDK in all aspects of the relationship—in other words, to do business with CDK, Hewlett was at the mercy of CDK.

67.    In its dealings with CDK, Hewlett did not draft the form written agreement that CDK requires, and it had no real bargaining power regarding the key terms.  CDK required the use of its standard-form and boilerplate document. Hewlett experienced an absence of meaningful

choice regarding key contract terms, including the contract's draconian remedy provisions and damages limitations.

68.    Because of its dependence on CDK, and the circumstances of the relationship, Hewlett signed a contract with unreasonable and unconscionable terms, and the clauses involved were so one-sided as to be unconscionable under the circumstances presented.

69.    In this context, CDK took advantage of its position of complete dominance against Hewlett.  In the relationship there was unequal bargaining power. There was also a lack of or limit of reasonably available alternatives for a necessary software system with dealer-specific data.

70.    CDK entered into its pre-printed agreement to provide the software system, including related goods, products, and incidental services, to Hewlett for the purpose of providing the technology necessary for Hewlett to conduct its dealership business.

71.    Separate and apart from that agreement, CDK obtained possession of, held, and controlled Hewlett's own dealer-specific compilation of data and information that was necessary for Hewlett's operations.

72.    In the pre-printed agreement to provide the software system, CDK represented that its own computer system's security would protect and secure Hewlett's data that was used in connection with operation of the software. CDK undertook independent obligations to prevent improper access to the data *used in connection with the software*, as well as to prevent loss and alteration of the data used in connection with the software.  CDK also undertook obligations to protect and/or was required to protect the confidentiality of the data, and to safeguard the data, including in a manner consistent with Title V of the Graham-Leach-Bliley Act (the "Safeguards Rule"), which CDK references in the pre-printed agreement.

73. In connection with the agreement, CDK was obligated to provide Hewlett with the necessary access to CDK's technology and computer system, and the specific software including goods, products, and incidental services associated with the software, as the essence of that agreement. CDK was the technology provider that allowed Hewlett's business operations to occur. CDK understood that Hewlett relied upon it for the necessary access and technology.

74. As a result of and following the Cyber Incident, CDK decided not to provide the necessary access to its technology, computer system, and software including the goods, products, and incidental services associated with it, and as a result, the agreement and its stated exclusive remedies wholly and completely failed for their essential purpose, leaving Hewlett without adequate recourse.

75. As a result of CDK's voluntary decisions, affirmative actions, and inaction, Hewlett had no access to its technology, the computer system, and the software, including the goods, products, and incidental services associated with it, and therefore no ability to operate its business for an extended period of time. Hewlett was forced to watch while its customers sought out competitor dealerships that were not reliant upon CDK to conduct business. CDK's decisions, actions, and inaction breached CDK's duties and obligations to Hewlett.

76. As a result of CDK's failure to provide access to the technology, computer system, and the software, including the goods, products, and incidental services associated with it, Hewlett sustained various damages, costs, expenses, and loss, for which CDK is liable, and for which Travelers, as Subrogee and Assignee, sues.

77. As a result of CDK's purposeful withholding of detailed information about what occurred and how long CDK would prevent access, Hewlett sustained additional damages, costs,

expenses, and loss for which CDK is liable, because Hewlett lacked the ability to make informed decisions about minimizing its losses.

78.    Further, as a result of CDK's conduct, acts, and omissions, and the particular facts and circumstances here, any purported and exclusive limitation of remedy and/or limitation of damage categories and/or limitations on damage amounts which CDK may assert are applicable to these disputes, claims, and losses fail for their essential purpose and are unconscionable and wholly unenforceable against Hewlett.

79.    CDK's conduct, acts, and omissions caused the essential purpose of the agreement (to afford access to the technology, the computer system, and the software, including goods, products, and incidental services associated with it and the ability to use data with the software), to fail, thus entitling Hewlett to recover its damages, losses, and expenses, pursuant to applicable common law and/or the Uniform Commercial Code, as adopted.

80.    Further, the terms of any purported limitation of liability, limitations of remedy, and/or limitations of damage categories or amounts which CDK may assert apply to these disputes, claims, and losses are unconscionable, including under the facts and circumstances presented here, and therefore unenforceable against Hewlett.  Hewlett is entitled to recover its damages, losses, and expenses, pursuant to common law and/or the Uniform Commercial Code, as adopted.

81.    Under the facts presented, enforcement of any alleged limits on categories and/or amounts of damages would be improvident, oppressive, and totally one-sided. CDK is not entitled to any one-sided and unreasonable protections as a result of its own wrongful conduct and failure to comply with its own duties and obligations, all of which were fully within the control of CDK.

## COUNT FOUR - NEGLIGENCE AND GROSS NEGLIGENCE

82.     CDK engages in a highly specialized technology business, by and through its operation of its own computer system, to provide technology products or goods, including access to its technology and dealership-specific data that Hewlett relies upon for all aspects of its dealer operations.

83.     CDK's highly specialized business also includes the technology and infrastructure used to host and make available Hewlett's dealer-specific data and information to Hewlett, while CDK maintains possession of that data and information.  CDK also provides various ancillary professional services, including but not limited to critical security.

84.     CDK owed Hewlett an extracontractual duty to act with reasonable care to secure and safeguard CDK's own computer system and to secure and safeguard Hewlett's own data and information (over which CDK had exclusive possession) and Hewlett's access thereto, and to establish redundancy protocols and backups, regarding CDK's computer system and technology, as well as regarding Hewlett's access to the technology and data at issue, and to use commercially reasonable methods to do so.

85.     CDK took on these obligations by, among other things, marketing and promoting CDK's ability to provide secure and reliable technology solutions and products (including by remote access), causing Hewlett to become reliant upon its technology and exclusive hosting of data, and CDK representing that it would make the data and information available to Hewlett.

86.     CDK owed Hewlett extra-contractual duties to ensure CDK's own computer system, and the systems holding Hewlett's dealer-specific data and information, maintained adequate security for the protection of Hewlett.  CDK owed a duty to exercise reasonable control over its own computer system for the purpose of carrying out its business consistent with the

heightened industry standards that exist. CDK owed a duty to exercise reasonable care in protecting Hewlett's access to CDK's computer system and its dealer-specific data and information, and Hewlett's ability to operate using its dealer-specific data. CDK owed a duty to provide adequate security, consistent with industry standards (which it stressed in its marketing), to ensure that its own computer system would function and adequately protect all data and information. CDK owed a duty of care to remedy any flaws or deficiencies within its own computer system without undue delay, and to employ segmented backups and disaster recovery programs to alleviate risks to Hewlett's access, and to Hewlett's data and information, and to allow Hewlett to maintain its operations.

87.     CDK owed Hewlett extra-contractual duties to ensure that Hewlett's dealer-specific data and information, including various extensive PII that was a part of such data, was protected and secured.

88.     CDK was aware of numerous, well-publicized cyber incidents and warned dealerships to be aware of the threats and ongoing incidents as well. CDK focused on and reported the potential hazards to those in the dealership industry and the fact that the dealership industry remained a high-priority and high-value target for cyber criminals. CDK represented to dealerships that they should use and rely on CDK's expertise to avoid these hazards and avoid becoming a victim of cyber criminals.

89.     CDK knew, or should have known, the risks inherent in operating its own computer system, and providing remote access to the computer system for the purpose of carrying out its business, including the vulnerability to cyber attacks and the importance of adequate security and resilience against such attacks. CDK knew, or should have known, the injury and damage that would result to others if the CDK computer system had inadequate security, and therefore suffered

a cyberattack, and failed to employ cyber resiliency practices, and therefore cause prolonged and unnecessary damage to others.

90.    CDK knew or should have known that its own computer system and procedures did not adequately safeguard the technology, as well as Hewlett's access to the system and Hewlett's access to its data and information.  Only CDK was in the position to ensure that its own computer system and protocols, and its backups and recovery programs, were sufficient.

91.    CDK's failure to abide by its duties was wrongful, reckless, willful, negligent, and/or grossly negligent in light of the foreseeable risks and known threats to this industry.  As an entity that exercises such an out-sized direct impact upon the automotive industry and its operations overall, CDK breached its duties to Hewlett in numerous ways, including but not limited to the following:

   a. Failing to disclose and/or misrepresenting the true level and adequacy of the security for CDK's own computer system, including to induce Hewlett to rely upon CDK's processes as they impact the overall dealership industry and to turn over its data and information;

   b. Failing to disclose risks to security, including to induce Hewlett to rely upon CDK's processes as they impact the overall dealership industry;

   c. Failing to exercise reasonable care and implement adequate security systems, protocols, training, and practices sufficient to protect CDK's own computer system and to protect Hewlett's data and information;

   d. Failing to comply with industry standard security measures for the industry leading up to the attacks against CDK's own computer system;

   e. Failing to adequately monitor, evaluate, and ensure the security of its own computer network and computer system;

   f. Failing to recognize in a timely manner that its own computer system had been compromised;

   g. Failing to timely and adequately disclose the extent of the compromise and extent of disruption to CDK's own computer system;

    h.   Failing to timely and adequately restore its own computer system;

    i.   Failing to employ segmented backups and disaster recovery programs to enable CDK to quickly restore operations; and

    j.   Failing to timely and adequately keep Hewlett updated on restoration of access and omitting relevant information from communications to Hewlett.

92.    As an entity that marketed to and induced Hewlett into doing business with CDK, CDK breached its duties to Hewlett in numerous ways, including but not limited to the following:

    a.   Failing to disclose and/or misrepresenting the true level and adequacy of the security, including to induce Hewlett to begin to use or continue to use CDK's technology;

    b.   Failing to disclose risks to security of the computer system and data, including to induce Hewlett to begin to use or continue to use CDK's technology and systems and to turn over its data and information;

    c.   Failing to ensure that CDK implemented adequate security systems, protocols, training, and practices sufficient to protect the computer system and Hewlett's data and information;

    d.   Failing to adequately monitor, evaluate, and ensure the security of the computer system and data;

    e.   Failing to adequately protect the data and information (including but not limited to consistent with the Graham-Leach-Bliley Act and Safeguards Rule), and allowing damage to the data and information;

    f.   Failing to timely and adequately restore the computer system and/or the access to the computer system and data by Hewlett;

    g.   Failing to employ segmented backups and disaster recovery programs to enable CDK to quickly restore access to the computer system and data by Hewlett; and

    h.   Failing to timely and adequately keep Hewlett updated on restoration of access and omitting relevant information from communications to Hewlett.

93.    Hewlett would not have lost access to its dealer-specific data and information and would not have sustained damage to that data and information but for CDK's intentional, willful, reckless, negligent, and/or grossly negligent acts and omissions, and its breach of its duties. CDK's failure to take proper security measures to protect its own computer system, and Hewlett's access,

including to its data and business operations, created conditions conducive to a complete shutdown of Hewlett's business.  It was foreseeable that CDK's failure to provide adequate security, as well as timely and forthright notice and restoration, would result in substantial injury to Hewlett.

94.    As a direct and proximate result of CDK's conduct, Hewlett has suffered damages and expenses, as well as economic and non-economic loss, including loss of sales, loss of service, repair and warranty work, loss of customers and customer relations, damage to reputation, direct mitigation costs, and others, for which Travelers sues and seeks recovery.

## COUNT FIVE - NEGLIGENT TRAINING AND SUPERVISING

95.    CDK engages in its highly specialized technology business by and through operation of its own computer system, which system further supports and/or affords access to technology and data that Hewlett relies upon for all aspects of its dealer operations.  CDK's own operations rely upon work by employees who must receive adequate training and supervision in the conduct of their work, including specifically the necessity to employ security measures that protect the CDK computer system, and the necessity to employ adequate measures to enable CDK to operate after a cyberattack occurs.

96.    CDK owed Hewlett an extra-contractual duty to adequately train and supervise its employees that operate, support, access, and/or repair and remediate CDK's own computer system, which in turn supports the access and data relied upon by Hewlett.  CDK owed Hewlett an extra-contractual duty to properly and adequately train and supervise its employees in their inherent obligations to maintain, at all times, adequate security of the CDK computer system for the protection of Hewlett.  CDK knew, or should have known, that human error, including through negligence, is a primary cause of allowing intrusion by cyber criminals into a computer system. CDK knew, or should have known, that its employees were acting in ways that were dangerous or

otherwise incompetent in the context of carrying out their responsibilities for ensuring computer safety and security.

97.    Upon information and belief, and based on CDK's own warnings to dealerships that human error causes most security breaches ("Did you know Most Security Breaches Are Caused By Human Error," (October 18, 2021) https://www.cdkglobal.com/insights/did-you-know-most-security-breaches-are-caused-human-error, last visited June 19, 2026), the Cyber Incident was caused, in whole or in part, by one or more CDK employees' error that could have been avoided by proper hiring and training.

98.    CDK negligently trained and/or supervised its employees (whose identities and positions are currently unknown to Hewlett as CDK exclusively controls that information and has not shared it with Hewlett), including by failing to provide adequate training, information and oversight, which resulted in the Cyber Incident and apparent access to CDK's own computer system, thereby disrupting CDK's computer system's ability to function and causing CDK to cut off access by Hewlett.  The injury to Hewlett was a reasonably foreseeable consequence of CDK's negligent failure to train and supervise. CDK's negligence in training and/or supervision proximately caused injury and damage to Hewlett, for which Travelers sues and seeks recovery.

**PRAYER FOR RELIEF**

Wherefore, for the foregoing reasons, Travelers Excess and Surplus Lines Company, as Subrogee and Assignee of Don Hewlett Chevrolet Buick, Inc., respectfully requests that the Court enter judgment in its favor, and award it:

A.  actual, consequential, and compensatory damages;

B.  punitive and/or exemplary damages;

C.  pre-judgment and post-judgment interest;

D.  reasonable attorneys' fees;

E.  costs and expenses; and

F.  such other and further relief that this Court may find just and equitable.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I, Vanessa M. Kelly, pursuant 28 U.S.C. §1746 certify that to the best of my knowledge and information, the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceedings.

**Dated: June 19, 2026**

**CLARK HILL, PLC**
*Attorneys for Plaintiff Travelers Excess and Surplus Lines Company, as Subrogee and Assignee of Don Hewlett Chevrolet Buick, Inc. d/b/a Don Hewlett Chevrolet Buick and d/b/a Hewlett Volkswagen*

By:     /s/ *Vanessa M. Kelly*
Vanessa M. Kelly
Clark Hill PLC
510 Carnegie Center, Suite 101
Princeton, New Jersey 08540
Tel. (609) 785-2926
Email: VKelly@ClarkHill.com


Toni Scott Reed**
(Texas State Bar No. 00788376)
Clark Hill PLC
901 Main Street, Suite 6000
Dallas, TX  75202
Telephone:  (214) 651-4345
Facsimile:   (214) 659-4091
TSReed@clarkhill.com

*\* Pro Hac Vice Application forthcoming*
